# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | No. 1:12-cr-00310 |
| v.   : | |
| : | (Judge Kane) |
| AUGUST RANALLI and   : | |
| DANIEL PACHECO-MORALES,   : | |
|    Defendants   : | |

## MEMORANDUM

Before the Court is Defendant Daniel Pacheco-Morales' motions <u>in limine</u> (1) to suppress evidence obtained during an allegedly invalid search (Doc. No. 362), and (2) to exclude evidence of Defendant's prior convictions (Doc. No. 358). The Court held a hearing on Defendant Pacheco-Morales' motion to suppress evidence on December 4, 2014.[1] Also before the Court is a joint motion <u>in limine</u> by Defendant Pacheco-Morales and his co-Defendant August Ranalli to exclude evidence of their alleged gang affiliation (Doc. No. 360). For the reasons that follow, the Court will deny Defendant Pacheco-Morales' motion to suppress evidence obtained during the search, deny the co-Defendants' motion to exclude evidence of gang affiliation, and will defer ruling on Defendant Pacheco-Morales' motion to exclude evidence of his prior convictions.

## I.   BACKGROUND

In the days preceding February 6, 2013, police obtained a state arrest warrant for Defendant Daniel Pacheco-Morales, and a warrant to search 315 Walnut Street, York,

---

[1] The following individuals testified at the hearing: Trooper Benjamin Wilson, Corporal Michael Schmitt, Trooper Shawn Wolfe, and Defendant Daniel Pacheco-Morales. (Hearing Transcript at 2.)

Pennsylvania in order to find him. (Hearing Transcript at 6:20-25, 26:1-2.) Police executed the warrant on the morning of February 6, 2013, with then-Trooper (now Corporal) Michael Schmitt as the team leader. (Id. at 6:11-25, 25:2-13.) Following the entry of a tactical team, officers located Defendant in an upstairs bedroom, where he was sleeping next to his girlfriend, Ms. Marjorie Cruz-Ramos. (Id. at 7:3-13, 8:7-19; 56:10-19.) Defendant's hands were bound in front of him, and he was allowed to get dressed. (Id. at 9:7-25, 10:1-2; 57:13-24.) Three children were also present elsewhere in the house. (Id. at 10:21-25, 56:17-19) All occupants were brought down to the first floor of the house. (Id. at 10:21-25.)

     Stark differences arose between the testimony of the officers and the testimony of Defendant regarding the remainder of the search. According to Trooper Benjamin Wilson and Corporal Schmitt, it was primarily Lieutenant Simon D. Wellman's responsibility, as a fluent Spanish speaker, to communicate with Defendant in Spanish that morning.[2] (Id. at 11:11-25, 12:1-5, 27: 14-25.) Lieutenant Wellman went through a Spanish language consent-to-search form with Defendant, and Wellman informed Schmitt that he read Defendant warnings pursuant to Miranda v. Arizona, 384 U.S. 436 (1966) ("Miranda warnings") in Spanish.[3] (Id. at 28:19-22, 29:19-25, 30:1-30) Although Defendant did not a sign consent-to-search form, he allegedly told

---

    [2] Defendant testified at the hearing in Spanish with the aid of an interpreter.

    [3] At the hearing on the motion to suppress, Defendant consistently objected to much of this testimony on hearsay grounds. (See 28:23-25, 32:14-16, 33:5-14.) However, "at a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." See United States v. Hubbard, 269 F. Supp.2d 474, 479 (D. Del. 2003) (quoting United States v. Raddatz, 447 U.S. 667, 679 (1980)); see also United States v. Gadsden, 410 F. App'x 500, 505 (3d Cir. 2011).

Lieutenant Wellman that they could search the upstairs bedroom and that drugs could be located in a black bag in the dresser, and he further referenced a safe. (Id. at 33:1-4, 34:1-6; 44:12-24.) Defendant also allegedly deferred to Ms. Cruz-Ramos regarding whether to give or withhold consent to search the remainder of the residence. (Id. at 34:1-6.) Thereafter, Schmitt reviewed a consent to search form with Ms. Cruz-Ramos, which she signed, providing permission to search the entire apartment. (Id. at 34: 9-25, 35:1-4.) Schmitt then told the troopers to begin to search the residence. (Id. at 35:21-25, 36:1-7.) Officers located drugs in the dresser and money in the safe, where Defendant indicated they would be found. (Id. at 35:11-16.) Wilson and Schmitt both testified that no officers levied any threats against Defendant or Ms. Cruz-Ramos, and that the interaction between the officers, Defendant, and Ms. Cruz-Ramos was calm and cooperative throughout the morning. (Id. at 10:5-13, 20:6-22, 21:14-25, 29:12-17, 36:17-25, 37:1-12.)

Thereafter, Defendant was brought back to the York County Drug Task Force office, where Trooper Shawn Wolfe was present. (Id. at 47:5-11.) According to Wolfe, Lieutenant Wellman was again present to communicate with Defendant in Spanish. (Id. at 47:20-25, 48:8-14.) Wolfe testified that Defendant was read Miranda warnings, and that Defendant then signed a waiver. (Id. at 47:20-25, 49:14-16, Gov't. Ex. No. 5.) Wolfe also testified that Defendant admitted that everything found in the residence was his, including the heroin and money found upstairs, and further that Defendant indicated that he would be willing to cooperate with law enforcement. (Id. at 49:23-25, 50:1-15.) Wolfe stated that Defendant was calm during the interview, and that no threats or physical force were utilized to get Defendant to sign the waiver. (Id. at 50:21-25, 51:1-16.)

Defendant's description of the scene that morning depicts a more frenzied series of

events, including testimony that Ms. Cruz-Ramos screamed when police first entered and continued to scream even after police brought her downstairs. (Id. at 57:8-10, 58:1-3.) Defendant also contests the officers' proposed sequence of events, testifying that the police officers searched the scene and his bedroom prior to seeking his consent at all.[4] Specifically, he asserts that, after he had been taken downstairs, the police officers "were coming down the stairs with some things in their hands. I didn't know what they were, and there I told him that in the room there were drugs. After I said that, then he put the bag that he had in his hand, they opened it up and they spread [the drugs] out." (Id. at 58:5-11.) He further contends that no officer provided Miranda warnings at the house, and that there were no officers on the scene at all who spoke to him in Spanish. (Id. at 58:12-13, 58:21-23, 60:13-20, 61:9-13.) As to whether he was provided Miranda warnings once he was later transported to the York County Drug Task Force office, he testified and that he was not shown the Miranda waiver form, and that no officer reviewed the rights shown on the form. (Id. at 67:3-14.) He also denied signing the waiver form, stating that he did not believe it was actually his signature, and that it did not reflect the

---

[4] He reaffirmed this sequence of events later in his testimony:

Q [Mr. Abom]: [Y]ou did tell the police officer at some point while you were in the house that they would find drugs in the house?

A [Defendant]: After I saw that they were coming down with something in their hands.

Q: Okay. And that something was the bag in which the drugs were found?

A: The bag?

Q: So is that yes that the bag that they had[,] had drugs in it?

A: Yes, sir. (Id. at 61:14-23.)

way he actually signs his signature.  (*Id.* at 66:21-25, 67:1-2, 68:22-25, 69:1, 70:4-14.)

## II. DISCUSSION

The Court will first address Defendant's motion *in limine* to exclude evidence obtained during an allegedly invalid search by police officers, followed by the *Miranda* issues introduced by Defendant's counsel at the hearing.  The Court will then address Defendant's motion to exclude evidence of Defendant's prior convictions.  Lastly, the Court will address the joint motion, by Defendant Pacheco-Morales and co-Defendant August Ranalli, to exclude evidence of their alleged gang affiliation.

### A. Defendant Pacheco-Morales' motion *in limine* to suppress evidence

Defendant contends that all the evidence found should be suppressed as he did not provide consent for officers to perform the search.  (Doc. No. 363 at 2-3.)  In the alternative, he contends that if the Court finds that Defendant did provide consent, the Court should find that the consent was involuntary, as Defendant was already under arrest.  (*Id.* at 4.)

#### 1. Consent to search

In his brief, Defendant contends that "law enforcement wrongfully or erroneously deemed [Defendant's] refusal of consent to search as providing consent to search," evidenced by the fact that Defendant did not sign a consent to search form.  (Doc. No. 363 at 2-3.)  Defendant further testified that police officers searched the house and located contraband *prior* to even seeking his consent.  (Hearing Transcript at 58:5-11, 61:14-23.)  The United States and their witnesses, however, contend that Defendant provided verbal consent to a search of the residence, only after which the officers performed their search of the premises.  (Doc. No. 374.)

The Fourth Amendment prohibits "unreasonable searches and seizures," and searches

without a warrant are presumptively unreasonable. United States v. Mathurin, 561 F.3d 170, 173 (3d Cir. 2009). However, "a search conducted pursuant to consent is one of the specifically established exceptions to the warrant requirement." United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003). When an individual gives valid consent to a search of his property, "any evidence discovered during such a search may be seized and admitted at trial." United States v. Kim, 27 F.3d 947, 955 (3d Cir. 1994). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Id. at 957. Such consent can be implied, rather than express; consent may be implied where the Defendant's actions at the time of his or her arrest could have been reasonably interpreted by the officers as communicating his consent to their search. See United States v. Walker, 529 F. App'x 256, 264 (3d Cir. 2013).

The Court credits the consistent testimony of Trooper Wilson and Corporal Schmitt, and finds by a preponderance of the evidence[5] that Defendant consented to a search of the premises. See United States v. Leveto, 343 F. Supp.2d 434, 442 (W.D. Pa. 2004) ("It is settled that at a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge.") (citations and quotations omitted). Wilson and Schmitt, both experienced police officers (Hearing Transcript at 5:22-25, 6:1-6, 24:13-23), described an orderly process that began by locating Defendant in an upstairs

---

[5] On a motion to suppress, "the applicable burden of proof is by a preponderance of the evidence." United States v. Mastronardo, 987 F. Supp.2d 565, 575 (E.D. Pa. 2013) (citing United States v. Matlock, 415 U.S. 164, 178 n.14 (1974)).

bedroom, and that ultimately resulted in Defendant providing consent to the search. After Defendant was brought downstairs by officers, Lieutenant Wellman, as the Spanish-speaking officer on scene, went through paperwork with Defendant in Spanish, including a consent to search form. (Id. at 12:1-10; 29:19-25, 30:1-30.) Schmitt testified that it was his understanding that Defendant eventually informed police – through Wellman, and in Spanish – that police could search the bedroom upstairs, and that Defendant further told Wellman where in the bedroom contraband would be located. (Id. at 33:1-4, 34:1-6, 44:12-24.) Drugs and money were later located precisely where Defendant said they would be found. (Id. at 35:11-16.) Although it is true that Defendant did not ultimately sign a consent to search form, the Fourth Amendment does not require that an individual consent to a search in writing. See United States v. Price, 558 F.3d 270, 279 (3d Cir. 2009) (finding that the suspect voluntarily consented to a search despite the lack of a signed consent form). As for consent to search the remainder of the house, Defendant deferred to Ms. Cruz-Ramos, who subsequently signed a form consenting to the search. (Id. at 34:9-25, 35:1-4.) Because the credible testimony of the officers establishes that, following a discussion in Spanish, Defendant provided express verbal consent for them to conduct their search, the Court will not suppress evidence on the grounds that Defendant failed to consent to the search.

 Although Defendant's testimony is starkly different – he testified that the officers pulled drugs from his bedroom before ever seeking his consent to a search, and that there were no Spanish-speaking officers on site during his arrest and the subsequent search – the Court does not find his testimony credible. For one, it is inconsistent with the experienced police officers' testimony: testimony that the Court already concluded was consistent, clear and convincing.

More importantly, the Court finds that exhibits directly contradicted Defendant's testimony, rendering that testimony less credible.  For example, during the hearing, a <u>Miranda</u> waiver form bearing his signature and executed later in the day on February 6, 2013 (once Defendant had been brought back to the York County Drug Task Force) was presented to Defendant.  (<u>Id.</u> at 66:12-25.)  However, Defendant denied that he had in fact signed the waiver form, stated he had never been presented with the form or had his rights explained to him, and stated further that it was not his signature.  (<u>Id.</u> at 66:12-25, 67:1-14.)  According to Defendant, he knew it was not his signature because he signs his name "Daniel Pacheco-Morales," but the waiver form was signed "Daniel Pacheco."  (<u>Id.</u> at 68:22-25, 69:1.)  However, the government then presented Defendant with a copy of his fingerprint card from that same day, which was also signed "Daniel Pacheco." and Defendant admitted that he remembered being processed on the day of his arrest, and he confirmed that it was his signature on the fingerprint card.  (<u>Id.</u> at 69:7-25, 70:1-14, Govt. Ex. No. 6.)  Whether Defendant was being disingenuous or had simply misremembered, the Court is satisfied that this places Defendant's credibility in doubt.  Accordingly, the Court affords little weight to his testimony contradicting the recollections of the testifying officers. <u>See</u> <u>U.S. v. Leveto</u>, 343 F. Supp.2d 434, 442 (W.D. Pa. 2004).

### 2. Voluntariness of consent to search

In the alternative, Defendant argues that if the Court concludes that he did in fact consent to the search, the consent was involuntary because Defendant was already under arrest.  (Doc. No. 363 at 4.)  Therefore, Defendant contends, his consent was not the product of "knowing, unrestrained choice," and the search ran afoul of the Fourth Amendment.  (<u>Id.</u>)  Defendant also cites the language barrier – Defendant speaks Spanish – as evidence that the search was

involuntary.  (Id.)

Although consent is an exception to the warrant requirement, the government bears the "burden of proving by a preponderance of the evidence that the search was made pursuant to a voluntary consent." United States v. Velasquez, 885 F.2d 1076, 1081 (3d Cir. 1989).  "For consent to be voluntary, 'it cannot be the product of duress or coercion, express or implied.'" United States v. Vaghari, 500 F. App'x 139, 149 (3d Cir. 2012) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)).  Whether consent was given voluntarily is a question of fact to be determined from the totality of all the circumstances.  United States v. Wilson, 413 F.3d 382, 388 (3d Cir. 2005).  Relevant factors to consider include, but are not limited to, "the setting in which the consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence, and educational background of the consenting [party]." Id.  Courts will also consider whether a defendant was informed that he had the right to deny consent, although the factor is not dispositive, and actual knowledge of the right to refuse consent is not a prerequisite to voluntariness.  See United States. v. Price, 558 F.3d 270, 279-80 (3d Cir. 2009).  No individual factor is controlling, and courts do not apply them mechanically when considering the totality of the circumstances.  See United States v. Parson, 599 F. Supp.2d 592, 602 (W.D. Pa. 2009)

The Court finds that Defendant's consent was voluntary.  Although the circumstances indicate that the officers surprised Defendant by executing the warrant early in the morning, while he was asleep, it appears that Defendant's consent was not obtained until later, after he had dressed and been brought downstairs, and after Lieutenant Wellman went through paperwork with him in Spanish.  (Hearing Transcript at 28:19-22, 29:19-25.)  Wilson and Schmitt both

testified that Defendant was calm, civil, and cooperative with the officers. (Id. at 10:5-13, 20:6-22, 29:12-17.)  No witness testified that any officer threatened Defendant or exerted any sort of physical coercion in order to obtain his consent.  There is also no testimony to suggest that the officers somehow misled Defendant into consenting to a search.  Considering the totality of the circumstances, the Court finds that his consent was voluntary.  Defendant's primary argument is that he was in custody at the time he consented (Doc. No. 363 at 4); although the fact that Defendant was in custody is relevant to the Court's determination, that is just one factor a court considers in its totality of the circumstances analysis.  See United States v. Watson, 423 U.S. 411, 424 (1976) ("[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search."); United States v. Ortiz, No. 10-131, 2010 WL 3701340, at *6 (M.D. Pa. Sept. 14, 2010) aff'd, 483 F. App'x 712 (3d Cir. 2012) ("Custody is but one factor in the voluntariness analysis.").  And although Defendant cites his Spanish-speaking background as an impediment (Doc. No. 363 at 4), the Court has already credited the testimony of the officers setting forth that Lieutenant Wellman was on hand to speak to Defendant in his native Spanish; under the circumstances, any confusion created by a language barrier was minimal.  Accordingly, because the Court finds that Defendant's consent was voluntary,[6] the Court will not suppress evidence as the fruit of an involuntary consent to search.[7]

---

[6] Although Defendant does not raise this point, the Court notes that for largely the same reasons as described above, the Court is satisfied that the consent to search provided by Ms. Cruz-Ramos was also voluntary.

[7] Because the court finds that Defendant voluntarily consented to the search, it will reject Defendant's alternative contention, based on Georgia v. Randolph, 547 U.S. 103 (2006), that the consent provided by Ms. Cruz-Ramos was invalid as to Defendant. (Doc. No. 363 at 3-4.)  The United States Supreme Court in Randolph held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be

### 3. Challenges related to <u>Miranda</u>

At the hearing, counsel for Defendant indicated that although the issue had not been briefed, Defendant now wished to present a challenge regarding <u>Miranda</u> warnings, and the waiver of same. At the conclusion of the hearing, Defendant's counsel indicated that he would submit supplemental briefing outlining the basis of his <u>Miranda</u> claims, and the Court issued a briefing schedule. (Doc. No. 416.) However, on January 19, 2015, Defendant's counsel filed a "statement in lieu of supplemental brief," indicating that he believed no briefing of additional issues was necessary, and that the Court should decide the motion to suppress based on the record already before the Court. (Doc. No. 419.) Based on Defendant's testimony, it appears that Defendant's Miranda challenge rests on his assertion that he was not read his Miranda warnings either at the house or later that day at the York County Drug Task Force.

However, the Court has already found that Defendant's testimony on this subject, asserting that he was never provided <u>Miranda</u> warnings at the time of his arrest and that he was not provided <u>Miranda</u> warnings later at the York County Drug Task Force despite a waiver form bearing his signature, is not credible for the reasons outlined in Section III.A.1, <u>supra</u>. The Court instead credits Corporal Schmitt's testimony that Lieutenant Wellman went over <u>Miranda</u> rights with Defendant at the scene, and Trooper Wolfe's testimony that Defendant signed a <u>Miranda</u> waiver after being informed of his rights at the York County Drug Task Force. Accordingly, the

---

justified as reasonable as to him on the basis of consent given to the police by another resident." <u>Id.</u> at 120. As this Court outlined above, the record indicates that Defendant consented to the search of the bedroom, and deferred to Ms. Cruz-Ramos regarding the remainder of the house. There is no credible testimony setting forth that he in fact objected to the officers' search. <u>See</u> <u>United States v. King</u>, 604 F.3d 125, 136 (3d Cir. 2010) (noting that <u>Randolph</u> applies when one resident is present and objects to the search). The same is true to the extent that Defendant relies on <u>United States v. Jones,</u> 335 F.3d 527 (6th Cir. 2003). (<u>See</u> Doc. No. 363 at 4.)

Court finds no basis to grant Defendant's motion to suppress based on an alleged Miranda violation, and Defendant's motion in limine to suppress evidence will be denied in its entirety.

### B. Defendant Pacheco-Morales' motion in limine to exclude evidence of prior convictions

Defendant Pacheco-Morales also moves the Court to exclude any evidence of Defendant's prior drug convictions; specifically, 1997 and 2007 convictions in Pennsylvania state court for manufacture, delivery, or possession with intent to deliver.  (Doc. No. 359.)  Defendant contends that these convictions have no relevance to the current proceedings and would be unduly prejudicial if presented to the jury.  (Id.)  The government counters that it intends to introduce the evidence of these prior distribution convictions to prove Defendant's intent to distribute, as well as to show his identity.  (Doc. No. 373.)

As a general rule, "all relevant evidence is admissible."  Fed. R. Evid. 402.  Evidence is "relevant" if its existence simply has some "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  Relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice."  Fed. R. Evid. 403.

Federal Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."  Fed. R. Evid. 404(b).  However, such acts may be introduced if presented for another purpose, such as intent, plan, knowledge, identity, or absence of mistake or accident.  Fed. R. Evid. 404(b)(2).  Thus, under Rule 404(b), prior act evidence is inadmissible unless the evidence is (1) offered for a proper non-propensity purpose that is at issue in the case; (2)

relevant to that identified purpose; (3) sufficiently probative under Rule 403 such that its probative value is not outweighed by any inherent danger of unfair prejudice; and (4) accompanied by a limiting instruction, if requested. United States v. Caldwell, 760 F.3d 267, 277-78 (3d Cir. 2014). "There is no question that, given a proper purpose and reasoning, drug convictions are admissible in a trial where the defendant is charged with a drug offense." United States v. Sampson, 980 F.2d 883, 887 (3d Cir. 1992) (emphasis added).

First, the Court is satisfied that the proffered evidence is relevant for the proper purpose of showing Defendants' intent. The United States intends to produce evidence that Defendant already admitted to possessing the drugs found in his apartment. (Doc. No. 373 at 7-8.) Therefore, according to the United States, Defendant's prior convictions are relevant to Defendant's intent; that is, the purpose for which Defendant possessed the drugs, if Defendant argues at trial that he did not intend to sell the drugs. See Sampson, 980 F.2d at 887 ("If the government offers prior offense evidence, it must clearly articulate how that evidence fits into a chain of logical inferences, no link of which can be the inference that because the defendant committed drug offenses before, he therefore is more likely to have committed this one.") The Court is satisfied that this is a relevant, non-propensity purpose for admission; the Third Circuit has noted that "evidence of past distribution is relevant to prove intent to distribute in a later distribution trial." United States v. Davis, 726 F.3d 434, 443 (3d Cir. 2013)[8]; see United States

---

[8] In Davis, the Third Circuit ultimately ruled that the District Court erred in admitting evidence of prior drug convictions. However, the Third Circuit was clear that it so found because the defendant's prior convictions were for drug possession, and the present charges were for drug distribution, a different crime. United States v. Davis, 726 F.3d 434, 445 (3d Cir. 2013) ("We join other circuits in declaring that a possession conviction is inadmissible to prove intent to distribute."). Here, both the prior convictions and the current charges pertain to distribution. See Lee, 573 F.3d at 166.

v. Lee, 573 F.3d 155, 166 (3d Cir. 2009) ("Defendant's prior drug trafficking conviction was properly admitted as evidence that [the defendant] intended to distribute any drugs in his possession.").[9]

However, regarding balancing under Rule 403, the Court finds that it cannot determine at this time whether any prejudice associated with the prior convictions "substantially outweigh" their probative value. The Third Circuit has noted that Rule 403 is primarily a "trial-oriented rule." In re Paoli R. Yard PCB Litig., 916 F.2d 829, 859 (3d Cir. 1990). This is because "a court cannot fairly ascertain the potential relevance of evidence for Rule 403 purposes until it has a full record relevant to the putatively objectionable evidence . . . [p]recipitous Rule 403 determinations, before the challenging party has had an opportunity to develop the record, are therefore unfair and improper." Id. In this case, given the potentially inflammatory nature of the evidence of prior convictions, and the limited purposes for which the government contends it is or may be relevant, the Court finds it is prudent to defer making any Rule 403 determination at

---

[9] Although the Court concludes the evidence of prior convictions is relevant for the limited purpose of proving intent to distribute, the Court is considerably more wary of the government's contention that it is admissible for the alternative purpose proving Defendant's identity as the seller of the drugs. See United States v. Allen, 619 F.3d 518, 524 (6th Cir. 2010) ("Prior acts or crimes can be admitted to show identity, provided they are of sufficient distinctive similarity with the charges in the indictment to create a pattern or modus operandi. ) (citations and quotations omitted). Here, Defendant's prior convictions were also for drug distribution, but the Court is without sufficient information to conclude that the specific details of the crimes are similar such that a jury to rationally find that the prior convictions are highly probative on the issue of identity. See United States v. Williams, 458 F.3d 312, 318 (3d Cir. 2006) ("[A]lthough a prior conviction need not rise to level of a "signature crime" to justify admission under Rule 404(b)'s identity exception . . . [the defendant's] prior conviction is simply too generic to prove identity.") (internal citation omitted). Stated differently, in the "identity" context, the proffered evidence is too close to propensity evidence to justify admission on that basis. See Sampson, 980 F.2d at 887 (noting that evidence of prior bad acts is improper propensity evidence "where the evidence only goes to show character, or that the defendant has a propensity to commit the crime").

14

this time regarding this evidence.  Accordingly, the Court will defer ruling on Defendant's motion to exclude the evidence of prior convictions at this time, and he may renew at trial his Rule 403-based challenge to the admission of evidence of Defendant's prior convictions.

### C. Defendant Pacheco-Morales and co-Defendant August Ranalli's joint motion in limine to exclude evidence of gang affiliation

Lastly, Defendant Pacheco-Morales and his co-Defendant August Ranalli jointly move the Court to exclude any evidence tending to prove that either individual is a member of or is otherwise affiliated[10] with the Latin Kings street gang, on the grounds that such evidence would unduly prejudice them before the jury.  (Doc. Nos. 360, 361.)  The United States contends that its evidence concerning the Latin Kings is admissible as intrinsic evidence of the conspiracy, and that any prejudicial spillover from introduction of the evidence is minimal.  (Doc. No. 373.)

As this Court has already noted above, generally "all relevant evidence is admissible." Fed. R. Evid. 402.  Evidence is "relevant" if its existence has some "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  Relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice."  Fed. R. Evid. 403.  Courts have observed that "[e]vidence of gang affiliation, like all other evidence, is admissible if relevant to a disputed issue, but if such evidence is more prejudicial than probative, it should be excluded." Munoz v. Grace, No. 05-4199, 2007 WL 2323134, at *13 (E.D. Pa. Aug. 10, 2007) (citing United States v. McKay, 431 F.3d 1085, 1093

---

[10] Regarding Defendant Pacheco-Morales, the United States asserts that it does not intend to show that he was a member of the gang, but was merely a "source of supply of cocaine for the Latin Kings."  (Doc. No. 373 at 7.)

(8th Cir. 2005)).

This Court also noted above that evidence of "other" bad acts is subject to the considerations of Federal Rule of Evidence 404(b).  See United States v. Caldwell, 760 F.3d 267, 277-78 (3d Cir. 2014).  However, "intrinsic" evidence is not subject to Rule 404(b). United States v. Green, 617 F.3d 233, 245 (3d Cir. 2010) (noting that there is "no 'other' wrongful conduct at issue [with intrinsic evidence]; [rather,] the [intrinsic] evidence is admissible as part and parcel of the charged offense").  The Third Circuit classified two types of evidence as intrinsic.  First, evidence that "directly proves" the charged offense is intrinsic.  Id. at 248. Secondly, "uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime."  Id. at 249.

The Court agrees with the United States that evidence concerning the Latin Kings gang is admissible as intrinsic evidence of the alleged conspiracy.  "The essential elements of a drug distribution conspiracy under 21 U.S.C. § 846 are: '(1) a shared unity of purpose, (2) an intent to achieve a common goal, and (3) an agreement to work together toward the goal.'"  United States v. Iglesias,, 156 (3d Cir. 2008) (quoting United States v. Bobb, 471 F.3d 491, 494 (3d Cir. 2006)).  The United States argues that its theory of the case is that the Defendants coordinated their drug trafficking activities through the Latin Kings, "and their association with each other . . . helps establish the group's criminal objectives." (Doc. No. 372 at 9-11.)  Thus, it is apparent to the Court that the evidence is not being introduced as improper character evidence; rather, evidence pertaining to the Latin Kings is highly probative intrinsic evidence that directly speaks

to and chronicles the Defendants' alleged involvement in the conspiracy.[11]

Moreover, even beyond the Court's categorization of the proposed evidence as intrinsic, the Court further finds that this evidence is not otherwise barred by application of the Federal Rules of Evidence as unfairly prejudicial. See Fed. R. Evid. 403, 404(b). Stated differently, unlike the proffered evidence of prior convictions discussed in Section III.B., supra, the Court concludes that this highly probative evidence related to the alleged gang affiliation survives balancing under Rule 403 and the Court need not defer on making such a ruling until trial. Although the Court is cognizant of the potential prejudice associated with evidence of gang affiliation, this is precisely the kind of evidence courts utilize as probative of conspiracy charges such as those brought against the Defendants. See United States v. Fitzgerald, 496 F. App'x 175, 180 (3d Cir. 2012) ("Evidence of Fitzgerald's prior relationship with his co-conspirators and his active engagement in the same criminal conduct . . . supports the jury's conclusion that he shared with them a unified purpose of conducting a drug distribution conspiracy and an intent to achieve that goal, and that they worked together to reach it."); United States v. Johnson, 28 F.3d 1487, 1497 (8th Cir.1994) ("[S]pecific and circumscribed evidence of gang association may be necessary to show 'the nature and extent of [the defendant's] association'"). Because of the highly probative nature of the evidence – the Defendants' alleged connections to the Latin Kings form part of the factual basis behind the United States' conspiracy charges against the Defendants – the Court does not find that any purported prejudice associated with gang evidence "substantially outweighs" its probative value. See Fed. R. Evid. 403. Accordingly, the Court

---

[11] The Court observes that the indictment in this case expressly points to the organization and coordination of the Latin Kings gang as forming a central part of the alleged drug trafficking conspiracy. (See Doc. No. 22.)

will not exclude the United States' proposed evidence of gang affiliation. An order consistent with this memorandum follows.